IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

NANCY AVINA, )
)
        Plaintiff, )
)
v. ) Case No. 4:19-cv-00480-RK
)
UNION PACIFIC RAILROAD )
COMPANY, )
)
        Defendant. )

## ORDER

Before the Court are what the Court interprets as Defendant's partial motion to dismiss for lack of subject matter jurisdiction (Doc. 131) and Defendant's motion for judgment as a matter of law (Doc. 135). The Court ruled on these motions on the record. After conclusion of the trial, which resulted in a hung jury, Plaintiff filed a motion for relief from an interlocutory order under Federal Rule of Civil Procedure 54(b). (Doc. 144.) For the reasons set forth below and for other reasons stated on the record, the Court **ORDERS**:

(1) Defendant's partial motion to dismiss (Doc. 131) is **GRANTED**:

    a. Plaintiff's § 1981 race discrimination claim for failure-to-promote into the 2017 1E Material Supervisor position is preempted by the Railway Labor Act ("RLA"), and is **DISMISSED** for lack of subject matter jurisdiction;

    b. Plaintiff's § 1981 race discrimination claim for failure-to-promote into the 2018 1E Material Supervisor position is preempted by the RLA, and is **DISMISSED** for lack of subject matter jurisdiction; and

    c. Plaintiff's ADEA age discrimination claim for failure-to-promote into the 2018 1E Material Supervisor position is preempted by the RLA, and is **DISMISSED** for lack of subject matter jurisdiction.

(2) The Court would otherwise find Defendant is entitled to judgment as a matter of law as to the claims dismissed above, and grant Defendant's motion for judgment as a matter of law.

(3) Plaintiff's motion for relief from interlocutory order (Doc. 144) is **DENIED** after careful review of the record, arguments, and authority cited therein.

## I. Background

Plaintiff filed her amended complaint alleging race and age discrimination and retaliation in violation of 42 U.S.C. § 1981 and age discrimination under 29 U.S.C. § 623 ("ADEA") on March 16, 2020. (Doc. 28.) On July 9, 2021, the Court granted in part Defendant's motion for summary judgment as to Plaintiff's retaliation claims and denied the motion in part as to Plaintiff's race and age discrimination claims. (Doc. 78.) The remaining allegations were (1) that Defendant failed to promote Plaintiff due to her race to a 1E Material Supervisor position in 2017 and 2018 and to an Administrative Aide position in 2018, and (2) that Defendant failed to promote her due to her age to the 1E Material Supervisor position in 2018 and the Administrative Aide position in 2018.[1] The case proceeded to a jury trial held over eight days from January 31, 2022, through February 10, 2022, ending in a declaration of mistrial when the jury was unable to reach a unanimous verdict. During trial, on February 6, Defendant filed a trial brief the Court interprets as a partial motion to dismiss regarding preemption. (Doc. 131.) On February 8, after the close of Plaintiff's evidence, Defendant filed a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). (Doc. 135.) In these filings, Defendant argues (1) Plaintiff's claims of discrimination regarding the 1E Material Supervisor positions are preempted by the RLA, and (2) Plaintiff failed to present a legally sufficient basis for a reasonable jury to find in her favor on her race and age discrimination claims. The Court orally **GRANTED** the motions concerning the preempted claims and ruled in the alternative that the Defendant was entitled to judgment as a matter of law as to the 1E Material Supervisor positions. (Doc. 155 at 60.)

## II. Legal Standards

Under Federal Rule of Civil Procedure 12(h)(3), "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." "Lack of subject matter jurisdiction, unlike many other objections to the jurisdiction of a particular court, cannot be waived. It may be raised at any time by a party to an action, or by the court *sua sponte*." *Bueford v. Resolution Trust Corp.*, 991 F.2d 481, 485 (8th Cir. 1993).

---

[1] The ADEA requires the filing of a Charge of Discrimination with the EEOC within 300 days of the alleged act of discrimination. 29 U.S.C. § 626(d)(2). Plaintiff filed her Charge on February 26, 2019. Applying the respective statute of limitations, Plaintiff's claims of discriminatory acts based on age alleged to have occurred prior to May 2, 2018, were found to be time barred. *Dorsey v. Pinnacle Automation Co.*, 278 F.3d 830, 825 (8th Cir. 2003). Thus, any age discrimination claim Plaintiff may have had regarding the June 2017 1E material supervisor position was found to be time-barred as it occurred almost 630 days before she filed her Charge. *Id.*

2

Case 4:19-cv-00480-RK   Document 168   Filed 05/11/22   Page 2 of 20

Under Federal Rule of Civil Procedure 50(a)(1), "[i]f a party has been fully heard on an issue" the court may "resolve the issue against the party" when "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *See Tatum v. City of Berkeley*, 408 F.3d 543, 549 (8th Cir. 2005) (under this rule, judgment may be entered against a party on a claim "that the party cannot maintain under the controlling law, so long as the party has been fully heard on the issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on the issue") (citation omitted). A motion for judgment as a matter of law "may be made at any time before the case is submitted to the jury." Rule 50(a)(2). In ruling on a motion for judgment as a matter of law, the court views the facts in the light most favorable to the non-movant and "does not weigh evidence or make credibility determinations." *Harrison v. United Auto Grp.*, 492 F.3d 972, 974 (8th Cir. 2007) (citation omitted).

### III. Defendant's Partial Motion to Dismiss (Doc. 131)

Defendant contends that three of Plaintiff's claims must be dismissed for lack of subject matter jurisdiction as preempted by the RLA. More specifically, Defendant contends the Court does not have jurisdiction "to determine any issue regarding the use of iTrakForce as a proper mechanism for bidding under the applicable collective bargaining agreement ('CBA') or to determine whether [Plaintiff] sufficiently applied for positions by faxing or e-mailing her resume." (Doc. 131 at 1.) Thus, Defendant asks the Court to dismiss the following claims for lack of subject matter jurisdiction: (1) § 1981 race discrimination claim for failing to promote Plaintiff into the 2017 1E Material Supervisor position; (2) § 1981 race discrimination claim for failing to promote Plaintiff into the 2018 1E Material Supervisor position; and (3) ADEA age discrimination claim for failing to promote Plaintiff into the 2018 1E Material Supervisor position.

The RLA establishes a mandatory arbitral mechanism for disputes "growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." 45 U.S.C. § 151a. Such disputes of this nature are preempted by the RLA. Thus, a threshold question of preemption is whether the dispute in question is a "major" dispute or a "minor" dispute. Major disputes are not preempted and minor disputes are.

"Major disputes relate to the formation of collective [bargaining] agreements." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994).

3

>These disputes relate to contract formation and arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

*Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 302 (1989) (citation omitted). Thus, "major disputes seek to create contractual rights." *Id*.

In contrast, "minor disputes" seek to "enforce [contractual rights]." *Id*. They arise "out of the interpretation or application of" existing collective bargaining agreements. *Id*. at 303 (quotation omitted). Such disputes contemplate

>the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. *The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case.* In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e.g., claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future.

*Id.* (emphasis added) (citation omitted).

Put another way, a dispute is minor, and therefore preempted, if it involves "the meaning of an existing [CBA] in a particular fact situation." *Hawaiian Airlines*, 512 U.S. at 253. In opposing preemption, Plaintiff stresses, "purely factual questions" about an employee's conduct or an employer's conduct and motives do not "require[] a court to interpret any terms of a collective-bargaining agreement." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405-06 (1988). In asserting preemption, Defendant urges, under the RLA, a CBA can give rise to implied terms arising from "practice, usage and custom." *Hawaiian Airlines*, 512 U.S. at 264 n.10.

Additionally, relevant to this case, the Supreme Court held:

>[I]f an employer asserts a claim that the parties' agreement gives the employer the discretion to make a particular change in working conditions without prior negotiation, and if that claim is arguably justified by the terms of the parties' agreement (i.e., the claim is neither obviously insubstantial or frivolous, nor made in bad faith), the employer may make the change and the courts must defer to the arbitral jurisdiction of the Board.

*Consol. Rail*, 491 U.S. at 310.

Finally, the Court notes that as a matter of statutory preference, it is not for the courts "to interpret or construe the language of the collectively-bargained for agreement between the parties; rather, our function is to determine whether this case implicates a question of contract interpretation." *Int'l Ass'n of Machinists v. Soo Line R.R.*, 850 F.2d 368, 376 (8th Cir.1988). "[W]hen in doubt, the courts construe disputes as minor," and are therefore preempted. *Sheet Metal Workers' Int'l Ass'n v. Burlington N. R.R. Co.*, 893 F.2d 199, 203 (8th Cir. 1990) (also noting courts construe disputes as minor "when the surrounding circumstances are ambiguous") (citations omitted). In light of this presumption, the Eighth Circuit Court of Appeals has reiterated that the party asserting that the dispute in question is "minor" "shoulders a 'relatively light burden' in establishing exclusive arbitral jurisdiction under the RLA." *Jenisio v. Ozark Airlines, Inc.*, 187 F.3d 970, 973 (8th Cir. 1999) (quoting *Schiltz v. Burlington N.R.R.,* 115 F.3d 1407, 1414 (8th Cir. 1997)).

With that framework in mind, the Court notes Plaintiff is correct that discrimination claims arising under federal law *generally* are not preempted by the RLA. *See Pittari v. Am. Eagle Airlines*, 468 F.3d 1056, 1060-61 (8th Cir. 2006); *Deneen v. Nw. Airlines, Inc.*, 132 F.3d 431, 439 (8th Cir. 1998). That is because "not every dispute concerning employment, or tangentially involving a provision of a collective bargaining agreement, is preempted." *Hawaiian Airlines*, 512 U.S. at 260.

Here, in her case-in-chief, Plaintiff examined Craig Mitchell, Defendant's Director of Strategic Sourcing, concerning the following provisions of the CBA, in an effort to establish Plaintiff had complied with the CBA's application requirements, i.e., by faxing or emailing her resume because iTrakForce is not mentioned in the CBA. Portions of the CBA include:

> (e-1) Partially excepted positions are excepted from the promotion, assignment, and displacement rules of this Agreement. Employees holding these positions shall be subject to the Union Shop Agreement (Appendix No. C), notwithstanding the exceptions set forth in Sections 2 and 3 thereof.
> . . .
>
> (e-3) Partially excepted positions covered by Sections (e-1) and (e-2) shall be bulletined in the department or office affected in accordance with Rule 11, but selection of the incumbent shall be a matter for the determination of the head of the department, subject only to the condition that preference shall be given to employees in service.
> Employees working in the Zone in which the partially excepted position is located shall be given preference, and if in the judgment of the head of the

5

department none of the applicants from such Zone are qualified, selection shall be made from the qualified employees in other Zones.

. . .

RULE 11 – BULLETINING POSITIONS

. . .

(b) The positions advertised under Section (a) shall be dated on the 1st and 16th of the month and issued for posting on those dates or the first succeeding business day. Employees desiring bulletined positions must have their applications, in duplicate, on file in the office of the bulletin, or in the office of the supervisor as may be specified on the bulletin, not later than noon of the tenth (10th) day from the date of bulletin. A copy of the application must be furnished Local/District Chairman direct by the employee [sic]. Applications for bulletined positions cannot be withdrawn subsequent to closing time and date specified in the vacancy notice [sic]. The official whose name is signed to the bulletin shall acknowledge receipt of employee application by returning one copy of the application with proper notice thereon, and the assignments shall be made as specified above. Shorter or longer time limits for bulletins and applications may be established by agreement.

. . .

(j) By agreement between the parties, the bulletining process may be amended for certain departments and/or locations. In addition, the parties may also agree to amend the bulletining process to allow the use of CRT machines.

Pl.'s Ex. 79.

Portions of Plaintiff's direct examination called for Mr. Mitchell to explain his interpretation of certain language in the CBA, as follows:

> Q. And what is Exhibit 79?
> A. This is the collective bargaining agreement. So this is for our – you know, I've heard the term union employees here today as well as agreement. We typically use the term agreement. But this is the agreement that really sets a lot of the rules for how we conduct our work and covers the Transportation Communications Union, which is stated here on the cover.
> Q. And if we had a physical copy sitting in front of you, you'd agree, it's a pretty hefty document. Right?
> A. It's a very thick document. And, quite often, labor relations assists in a lot of the determinating [sic] how it applies to the work.
> Q. ***And I'm just going to ask you some of your understanding about some of the policies involved here today***. If you don't know the answer –
> A. Sure.
> Q. – if you can tell me someone that I could talk to who would know the better answer, that would be great. Okay?

6

Case 4:19-cv-00480-RK   Document 168   Filed 05/11/22   Page 6 of 20

A. Okay.
Q. I've got my CliffsNotes version here. You'd agree that the entirety of the company's interaction with a union employee is governed by this CBA.
A. Correct.
Q. You'd agree that the entirety of the company's interaction with a union employee is governed by this CBA. Right?
A. Correct.
Q. *Ms. Eaton,*[2] *could you flip to what's Bates stamped as 2235. And if you could zoom in on that section that's E-1.*[3] Mr. Mitchell, obviously, you're aware that part of the claims of this case are that Ms. Avina was not properly considered for the supervisor 1E position in the supply department. Right?
A. Yes.
Q. *And you're also aware that the union essentially states that the majority of bids are determined on a seniority basis. Right*?
A. *If they're not covered under the 1E, they are.*
Q. *Exactly. So this is one of the few exceptions to the union where a position is what we've heard as right of selection. Right?*
A. *That's correct.*
Q. Okay. And as we see here on this page, I believe that's what we're talking about. *And if, actually, we can blow out E-3.*[4] *Mr. Mitchell, E-3 says, Partially accepted positions covered by sections E1 and E2 shall be bulletined in the department or office affected in accordance with rule 11 but selection of the incumbent shall be a matter for the determination of the head of the department. Right?*
A. Yes.
Q. *Subject only to the condition that preference shall be given to employees in service. So the 1E position is right of selection. But it's still needs to be bulletined. Right?*
A. Yes.
Q. *And its selection is up to the right of the head of the department. Is that right?*
A. *That's what it states here. It's – it's really – the practice has been a panel that looks at applicants.*
Q. Okay. <u>So what's actually done in practice is not what's written in the CBA?</u>
A. <u>It's how you determine what the head of the department is. But by operation, we've never had a grievance filed. But the local management with a panel of – a diverse panel would make that selection.</u>
Q. <u>You'd agree with me, though, that the CBA says that it's the head of the panel – or the head of the department's decision. Right?</u>
A. <u>I do see that.</u>
Q. <u>Nothing else in that section that we've looked at tells the head of the department how to actually perform the process of placing the 1E. Right?</u>

---

[2] Ms. Eaton served as Plaintiff's paralegal.
[3] Although reproduced in the transcript as "EI," the reference was to "(e-1)," excerpted above.
[4] Although reproduced in the transcript as "E-3," the reference was to "(e-3)," excerpted above.

7

**A.** *No.*

Q. Ms. Eaton, could you please go to Bates 2244. All right. If you could blow out rule 11, section A, B, and C. Hopefully, we can read that. Mr. Mitchell, are you familiar with the bulletining process?

A. Yes.

Q. And tell me what the bulletining process is for open positions?

A. As it states here, there should be a period of 10 calendar days. And – well, let me just read it to you since it's right here in front of us.

Q. Sure.

A. All new positions and vacancies of 30 days or more duration, excluding vacations, shall be promptly bulletined on bulletin board accessible to all employees in the affected zone for a period of ten calendar days. The bulletin shall show wage grade, location, title, duties of position, rate of pay, hours of service, assigned meal period, rest days, and, if temporary, the probable and expected duration. Copies of bulletins shall be furnished to the general chairman and local district chairmen.

Q. So, essentially, a position has to be posted on this bulletin for 10 days. Right?

A. Right.

Q. And is that to alert the union or agreement workers that there is this potential opportunity in their zone?

A. Yep. Share opportunities with everyone.

Q. *In subsection – or, I'm sorry, nothing on there mentions anything beyond that it's just got to be posted on the bulletin. Right?*

A. *Doesn't say it specifically there. Doesn't talk about the means.*

Q. *If you could blow out section B, please. The second sentence says, Employees desiring bulletined positions must have their applications in duplicate on file in the office of the official whose name is signed to the bulletin or in the office of the supervisor as may be specified on the bulletin not later than noon on the 10th day of the date. Right?*

A. Yes. I see that.

Q. *So another section is they've got to have their apps to the supervisor or the named person on the bulletin. Right?*

A. *The application. Correct.*

Q. *Doesn't say anything about any other requirement. Does it?*

A. *I mean, there's – there's other sentences here, but, no.*

Q. *Sure. Nowhere in there does it say you've got to go put on your application on [iTrakForce]. Does it?*

A. *Doesn't specifically say that. That is our process though.*

Q. *And doesn't say that in the CBA though, does it?*

A. *It does not say that, just our process.*

Q. And didn't say anywhere in The How Matters?

A. Correct.

Q. Or any other policy we've looked at so far?

A. Correct.

Q. And as we saw previously in the E1 rule, rule 11 does apply even though this is an exempt right of selection position. Correct?

8

Case 4:19-cv-00480-RK   Document 168   Filed 05/11/22   Page 8 of 20

> A. Correct.
> Q. Real quickly, Ms. Eaton, if you could go to 2250. And rule 19, please. Mr. Mitchell, rule 19 applies to positions abolished and reinstated. Right?
> A. That is correct.
> Q. And just – I just want to make sure that we're understanding on A. If a position is abolished and reinstated by bulletin in the same or another zone, within 90 days, the last regularly assigned incumbent shall be returned to the position without regard to seniority if they do those three steps. Right?
> A. That is correct. Yes.
> Q. Okay. And that's if the same exact position is reinstated after an abolishment. Right?
> A. Yes. The incumbent.
> Q. If we could flip really quick to page 2272. Mr. Mitchell, we see again in this collective bargaining agreement that there's a policy about discrimination. Right?
> A. Yes, sir.
>   . . .

(Doc. 130 at 21-27) (emphasis added).

Plaintiff conceded at oral argument that an interpretation of the CBA is warranted in some discrimination cases and directed the Court to *Johnson v. Humphreys*, 949 F.3d 413 (8th Cir. 2020). The *Johnson* plaintiff claimed he was terminated due to his race; the defendant claimed the plaintiff was terminated because he committed an offense of "extreme seriousness" as defined in the CBA. *Id.* at 415.

In *Johnson*, as here, the plaintiff argued that his claim involved "purely factual questions and that no CBA interpretation is required from the face of the complaint and his *prima facie* case." 949 F.3d at 416. Citing *Lingle* and *Hawaiian Airlines*, the *Johnson* plaintiff argued he could prevail by showing the retaliatory intent of his employer. *Id.* The Eighth Circuit determined, however, that the plaintiff's *prima facie* case of discrimination required showing that he was following established rules and practices under the CBA and involved whether an offense at issue was one of "extreme seriousness," a term unique to the CBA. *Id.* The *Johnson* court thus held that the CBA was "inextricably bound up" in the *prima facie* case and found the matter was preempted. *Id.*

Defendant points to *Hogan v. Northwest Airlines, Inc.*, 880 F. Supp. 685 (D. Minn. 1995), where a district court addressed a question analogous to the one in the instant case: In a disability discrimination failure-to-hire claim under the Americans with Disabilities Act ("ADA"), did the issue of whether the plaintiff "applied" for the position in question involve the interpretation and

9

application of the procedures for filling vacancies set forth in the CBA? *Id*. at 689. There, the plaintiff argued that his dispute did not involve the interpretation or application of any term of the CBA because he had not alleged that the employer violated the CBA by failing to hire him. *Id*. at 689-90. The plaintiff also asserted that the CBA did not apply to the positions at issue there because those positions became "company select" positions outside the scope of the CBA's vacancy procedures when it appeared that no "eligible bidders" had applied to fill them.

In finding preemption, the *Hogan* court rejected plaintiff's contentions, as follows:

> Northwest argues before this Court that Hogan did not apply for the Bulletin Number 92-360 position in accordance with the procedures set forth in Article 9 of the Blue Book. To determine whether Hogan has stated a prima facie case of discriminatory failure to hire under the ADA, the Court must necessarily determine whether Hogan's conduct constituted an "application" under the terms of the collective bargaining agreement. Such a determination requires the interpretation and application of the vacancy provisions of the Blue Book, a determination committed by Congress to the exclusive procedures of the RLA. Plaintiff's claim for disability discrimination cannot be decided "wholly apart" from the collective bargaining agreement; his claim does not present "purely factual issues" which do not require interpretation and application of the collective bargaining agreement.

*Id*. at 690-91.

As in *Hogan*, here, Plaintiff must demonstrate that she applied for the positions at issue. *Austin v. Minnesota Min. & Mfg. Co*., 193 F.3d 992, 995 (8th Cir. 1999) (the elements for a failure-to-promote claim include showing that: (1) the employee was a member of a protected group; (2) she was qualified and *applied for* a promotion to a position for which the employer was seeking applicants; (3) she was not promoted; and (4) similarly situated employees, not part of the protected group, were promoted instead); *see also Green v. City of St. Louis*, 507 F.3d 662, 666 (8th Cir. 2007) ("To establish a prima facie claim for discriminatory failure to hire, a plaintiff must show that he applied and was qualified for a job for which the employer was seeking applicants.") (quotation marks omitted).[5]

---

[5] The Court notes the Eighth Circuit has "held that formal application for a job opening will not be required to establish a *prima facie* case of discrimination if the job opening was not officially posted or advertised *and* either (1) the plaintiff had no knowledge of the job from other sources until it was filled, or (2) the employer was aware of the plaintiff's interest in the job notwithstanding the plaintiff's failure to make a formal application." *Gentry v. Georgia-Pac. Corp*., 250 F.3d 646, 652 (8th Cir. 2001) (emphasis added) (cleaned up). Here, there is no meaningful question the job opening was sufficiently posted or advertised, thus taking the exception out of the purview of this case.

Even if there were a meaningful question, the relevant inquiry is whether Plaintiff properly applied given that she provided her resume to her supervisor but did not submit an application through iTrakForce.

With that factual and legal background in mind, the Court finds that, as was the case in *Johnson* and *Hogan*, the issues in this case involve the interpretation of an existing CBA and implicate a question of contract interpretation, thus reflecting a "minor" dispute. *See also Boldt v. N. States Power Co.*, 904 F.3d 586 (8th Cir. 2018) (applying *McDonnell Douglas* framework[6]; affirming ruling that CBA included fitness-for-duty policy which required interpretation to determine whether plaintiff had to prove he was "qualified" to continue working). The excerpt of the CBA adduced at trial and Mr. Mitchell's testimony make clear two provisions of the CBA must be interpreted in deciding whether Plaintiff properly applied for this position.[7]

First, Plaintiff maintains she applied for the positions in question by delivering her resume to her supervisor(s), and Plaintiff asks the factfinders to determine that such means of application was sufficient under the CBA. In other words, given that the CBA requires "[e]mployees desiring bulletined positions must have their applications, in duplicate, on file in the office of the bulletin, or in the office of the supervisor as may be specified on the bulletin," Plaintiff argues it is a question of fact whether the submission of her application to her supervisors other than through iTrakForce was sufficient. Fundamentally, however, Plaintiff asks this Court and/or the jury to determine the meaning of the CBA in the particular situation of Plaintiff's application/bid for the IE Material Supervisor position in 2017 and in 2018. Bulletining and bidding on (applying for) those positions falls squarely under the provisions of Rule 11 of the CBA. The relevant question here, though, is what does "must have their applications, in duplicate, on file in the office of the bulletin, or in the office of the supervisor" mean? Plaintiff's examination of Mr. Mitchell reflects significant questioning over the CBA's language pointing to the requirement that applicants "must have their applications, in duplicate, on file in the office of the bulletin" – with that language in the CBA, did

---

The question of whether Plaintiff applied simply is undetermined (and undeterminable for this Court): perhaps Plaintiff properly applied under the operative CBA by submitting her resume to her supervisor and she was not meaningfully considered for the position for invidious reasons; perhaps she did not properly apply because she did not use iTrakForce, an accepted practice permissible under a proper interpretation of the CBA. Regardless, it is *Plaintiff's* case-in-chief that indicates the answer to this question is inextricably tied to interpretation of the CBA.

[6] *See infra* pp. 13-14 regarding *McDonnell Douglas* framework.

[7] While Defendant did not necessarily identify the language addressed here, the Court reiterates that "[l]ack of subject matter jurisdiction, unlike many other objections to the jurisdiction of a particular court, cannot be waived. It may be raised at any time by a party to an action, or by the court *sua sponte*." *Bueford*, 991 F.2d at 485.

Defendant require submission (or could Defendant require submission) of the application through iTrakForce?[8] The answer cannot be known on this record and requires interpretation of the CBA.

Second, Plaintiff asserts supervisors Samantha Miller and Jennifer Perkins, respectively, as "head of the department" made the discriminatory decisions not to hire Plaintiff. Evidence of these supervisors' alleged workplace behavior was adduced at trial to support Plaintiff's case. In contrast, as illustrated in Mr. Mitchell's testimony, Defendant asserts the "head of the department" making the decision was in fact a panel. Testimony adduced at trial then indicated the panel making the employment decision was comprised of multiple individuals, one of whom was from local management, and the rest of whom were typically from other locations (along with possibly a customer); interviews were conducted by telephone. (Doc. 150 at 165-66; Doc. 152 at 36). To be clear, the intertwined nature of the application process and the CBA was presented in Plaintiff's case-in-chief when Mr. Mitchell was asked whether "what's actually done in practice" (i.e. using a panel to consider applicants) was in accordance with "what's written in the CBA" (i.e., "selection of the incumbent shall be a matter for the determination of the head of the department"), Mr. Mitchell interpreted the CBA as follows: "It's how you determine what the head of the department is . . . [b]ut the local management with a panel of – a diverse panel would make that selection." Thus, the question of what or who constitutes the "head of the department" for purposes of selecting the incumbent cannot be a determination made in this Court.

The Court's conclusion that interpretation of the CBA is necessary is confirmed by additional reference to Mr. Mitchell's testimony when he was asked whether the CBA discusses iTrakForce. Mr. Mitchell responded that it does not, but he noted there are "other sentences" in the CBA and that using iTrakForce was the process used to apply for the 1E Material Supervisor jobs. In fact, the CBA allows: "[b]y agreement between the parties, the bulletining process may be amended for certain departments and/or locations. In addition, the parties may also agree to amend the bulletining process to allow the use of CRT[9] machines." Whether and to what extent the bulletining process was amended or whether and to what extent the CBA may otherwise be

---

[8] In addition, Plaintiff presented Rule 11 and the posted bulletins for the positions to several witnesses at trial in an effort to establish she properly applied in accordance with the bulletins and was not required to use iTrakForce to bid on those positions. Similarly, Plaintiff showed witness Jeffrey Anderson Form 5 ("Application for Bulletined Position") in Appendix M of the CBA to demonstrate Plaintiff properly applied by submitting her resume only. *See* Pl.'s Ex. 79, p. 130.

[9] CRT is not defined in this provision of the CBA.

12

Case 4:19-cv-00480-RK    Document 168    Filed 05/11/22    Page 12 of 20

interpreted to allow Defendant to require an application through iTrakForce requires an interpretation of the CBA.[10]

The Court's conclusion the 1E Material Supervisor claims are preempted is further confirmed through juror confusion about the CBA and its relationship to iTrakForce. Testimony from Defendant's first witness, Jacob Langel, led a juror to submit the following question, which the Court read:

> THE COURT: Why is [iTrakForce] absent from the CBA and handbook?
> THE WITNESS: [iTrakForce] is just a system that we created to facilitate the bulletin and bidding of application – or of jobs for the nonops.

In a nutshell, the trial was replete with questioning, testimony, and evidence revealing the necessity of interpreting specific provisions of the CBA, and at least one factfinder sought guidance on the absence of a certain provision of the CBA.

In so ruling, the Court notes Plaintiff correctly argues a defendant cannot be the party to inject the CBA in a discrimination case so as to take the matter outside the jurisdiction of the district court. *Humphrey v. Sequenta*, 58 F.3d 1238 (8th Cir. 1995) ("We must find not just that a pre-emption defense is present, but that the claim is completely federal from the beginning") (cleaned up). Although at oral argument Plaintiff contended she introduced the CBA and related evidence in anticipation of confronting the defense theory that she did not apply for the position, it was clear since opening statements that Plaintiff, not Defendant, first injected the interpretation of the CBA into the case and, key to this ruling, that Plaintiff *needed* to introduce the CBA to the jury to prove she properly applied for the 1E Material Supervisor positions as part of her *prima*

---

[10] In subsequent briefing, Plaintiff concedes the CBA allows Defendant to require iTrakForce be used to apply for these positions and argues there is a mere factual dispute as to whether Defendant in fact adopted a policy requiring submission of bids through iTrakForce as to 1E positions. (Doc. 144 at 8-9.) However, this nuanced argument was not evident to at least some portion of the jury, as noted *infra*, who asked a defense witness why the iTrakForce requirement was not included in the CBA. This is no wonder, as Plaintiff and Defendant both showed the CBA and questioned witnesses about the meaning of it, including how to properly apply for a given position. Even if Plaintiff's concession rendered Defendant's argument on this point moot, however, the interpretation of the requirement that applicants "must have their applications, in duplicate, on file in the office of the bulletin, or in the office of the supervisor" and "head of department" under the governing CBA nonetheless remain outstanding matters.

*facie* case.[11]  In other words, the tone and tenor of Plaintiff's opening statements[12] and direct examination soon thereafter of Mr. Mitchell roundly invoked reliance on and interpretation of portions of the CBA from the outset, and that theme resounded throughout the trial. Testimony from additional witnesses through Plaintiff's case-in-chief continued to address the issue of

---

[11] Plaintiff maintains whether she applied is a factual issue to be determined by the jury. But at base, accepting Plaintiff's testimony as true: Plaintiff submitted her resume to her supervisor in various ways, but she did not submit an application through iTrakForce. As noted throughout this order, the resolution of whether Plaintiff actually applied requires determining whether she acted in accordance with the CBA and/or whether Defendant properly (or invidiously) required her application to be submitted through iTrakForce.

[12] The Court acknowledges that "the bare fact that a collective bargaining agreement will be consulted" and that "mere reference to or consultation of the CBA" are not enough to trigger preemption. *Hawaiian Airlines*, 512 U.S. at 261 n.8; *Markham v. Wertin*, 861 F.3d 748, 755 (8th Cir. 2017). The Court nonetheless notes invocation of the CBA began in opening statements and continued through the testimony as it was necessary for Plaintiff to fully present or prove her case. Had mere reference to or consultation of the CBA been the extent of this issue, the Court would be inclined to rule for Plaintiff. The portions below from Plaintiff's opening statements, however, were only the preface:

> . . . The rules of the road for employment cases are actually laid out in Union Pacific's own policies. This way, management employees understand what the law requires of employers. And it's up to juries to enforce these laws. . . .
>
> During trial, you'll hear testimony from a man by the name of Craig Mitchell. Mr. Mitchell is actually sitting right here as the designated corporate representative for Union Pacific and that means the testimony he's giving is essentially the same as if we were able to put the company up on that stand and ask questions of Union Pacific. He was also the director of supply operations who oversaw the department in which Nancy Avina spent the majority of her time. The same department in which she continually applied for positions at issue before you today. He will tell us the promotional process that is supposed to be carried out at Union Pacific. . . .
>
> Throughout this week, we're going to be using a lot of legal and railroad terminology that some people might not be too familiar with. So I'd take a second to introduce you to some of these words and phrases, the first of which is the EEO policy. EEO stands for equal employment opportunity. **And Union Pacific has policies in place that they claim enforce the facilitation of equal employment opportunities for all its employees in hiring, promotion, and treatment. It means exactly what it says when it's enforced. Every employee should have equal opportunity at all employment levels at every step of the process. The positions that are at issue in this case are what are called right of selection positions. Union Pacific contracts with unions in order to fill a lot of their employee positions. And many of these positions are done – or filled on what's called a seniority basis where somebody has the most seniority rights, they get the position. Three positions that we're going to talk about are right of selection positions, which means that they are, technically, union positions, but the strict union seniority rules do not apply. Union Pacific does get to select the most qualified person even if they don't have the earliest seniority date.**
>
> **The supervisor 1E position that Nancy applied for in 2017 and 2018 is one of these right of selection positions. It is the second in command in the supply department at the warehouse level.**

14

whether Plaintiff needed to use iTrakForce (including the deposition testimony admitted into evidence at trial of Plaintiff's former supervisor, Samantha Miller).

The Court concludes that to determine whether Plaintiff can establish she applied for the 1E Material Supervisor positions requires analysis of whether Plaintiff properly applied under the terms of the CBA. This inquiry goes beyond "'purely factual questions' about an employee's conduct or an employer's conduct" and instead requires a determination of whether Plaintiff's applications were sufficient, under the CBA, to put her in meaningful consideration for the promotions. *See Hawaiian Airlines, Inc.*, 512 U.S. at 261 (quoting *Lingle*, 486 U.S. at 407). As in *Hogan*, Defendant argues that its means of accepting applications was allowed under the CBA and Plaintiff did not properly apply for the job.[13] Thus, to show that she applied for the position – an element of the *prima facie* case – Plaintiff must show her applications were in accordance with a proper interpretation of the CBA. Portions demanding interpretation include:

(1) the meaning of the requirement that applicants "must have their applications, in duplicate, on file in the office of the bulletin, or in the office of the supervisor" given Plaintiff had to apply for the position, given Defendant maintains the only proper way was to apply through iTrakForce, and given none of Plaintiff's proffered means of applying necessarily complied with the language of the CBA; and

(2) what constitutes "head of the department" particularly given that Plaintiff asked Mr. Mitchell whether "what's actually done in practice is not what's written in the CBA," his response "It's how you determine what the head of the department is . . . [b]ut the local management with a panel of – a diverse panel would make that selection."

The Court's conclusion that the matter is preempted is bolstered by the CBA's allowance for amendment of application procedures (*see supra* Rule 11(j)), by precedent (*Consol. Rail*, 491 U.S. at 310) allowing for the changes in the CBA, by Mr. Mitchell's testimony that the CBA excerpts he was questioned about on direct examination in Plaintiff's case-in-chief did not include the whole of the agreement ("I mean, there's – there's other sentences here"), and by juror questions indicating potential confusion over whether the CBA necessarily needed to include reference to iTrakforce as the means of application for the supervisory positions in question. The Court therefore finds that Plaintiff's *prima facie* showing for her discrimination claims against Defendant

---

[13] To the extent Plaintiff meant to claim an exception applied (*see supra* n.5), such determination would also fall within the purview of the CBA.

15

concerning the 1E Material Supervisor positions is substantially dependent upon an analysis of the CBA, and is therefore completely preempted and precluded by the RLA. *See Sheet Metal Workers'*, 893 F.2d at 203 (holding "when in doubt, the courts construe disputes as minor" and disputes are to be construed as minor "when the surrounding circumstances are ambiguous").

For these and other reasons set out on the record, the Court dismisses the following claims for lack of subject matter jurisdiction: (1) § 1981 race discrimination claim for failure-to-promote into the 2017 1E Material Supervisor position; (2) § 1981 race discrimination claim for failure-to-promote into the 2018 1E Material Supervisor position; and (3) ADEA age discrimination claim for failure-to-promote into the 2018 1E Material Supervisor position.[14]

## IV. Defendant's Motion for Judgment as a Matter of Law

Assuming the Court had not found the above-mentioned claims preempted by the RLA, the Court would otherwise grant Defendant's motion for judgment as a matter of law as to those claims. In its motion for judgment as a matter of law on each of Plaintiff's claims, Defendant argues (1) Plaintiff failed to present evidence of discrimination, (2) Defendant had legitimate non-discriminatory reasons for its actions, (3) Plaintiff failed to present sufficient evidence her age or race were the "but for" cause in Defendant's promotion or hiring decision, and (4) Plaintiff failed to present evidence she suffered damages, and failed to produce evidence that would permit a reasonable jury to award punitive damages. After careful consideration of the evidence presented, viewed in the light most favorable to Plaintiff, the Court finds Defendant would be entitled to judgment as a matter of law on Plaintiff's claims regarding the 2017 and 2018 1E Material Supervisor positions were they not preempted by the RLA.

Plaintiff's claims for race and age discrimination under 42 U.S.C. § 1981 and 29 U.S.C. § 623 (ADEA) are analyzed under the *McDonnell-Douglas* burden-shifting framework. *Lake v.*

---

[14] The Court is cognizant of Plaintiff's visceral frustration that Defendant "first raised the issue of preemption on Friday, February 4, 2022, the fourth day of an eight-day trial[,] more than two and a half years after Plaintiff filed her complaint and more than a year after Defendant sought summary judgment accompanied by suggestions that specifically point out the fact that the 1E position is governed by a collective bargaining agreement." (Doc. 144 at 3.)

There is no clear reason why the jurisdictional question resolved now was not raised earlier, and Plaintiff's frustration is well taken. An earlier resolution would have reduced the resources spent conducting extensive discovery and an eight-day trial and may have avoided any statute of limitations issue that may arise following this dismissal. The Court does not condone Defendant's decision to raise the issue so late in the proceedings. Nonetheless, the mistrial allowed for full briefing of the issue, and as the parties well know, subject-matter jurisdiction is not an issue that can be waived.

*Yellow Transp., Inc.*, 596 F.3d 871, 873 (8th Cir. 2010) (the *McDonnell-Douglas* framework applies when a discrimination case is based on circumstantial rather than direct evidence).[15]

> Under *McDonnell Douglas*, the plaintiff initially has the burden to establish a prima facie case of discrimination. A prima facie case creates a rebuttable presumption of discrimination. The burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for its decision. If the defendant provides such a reason, the presumption disappears, and the burden shifts back to the plaintiff to show that the proffered reason was pretext for discrimination.

*Id.* at 873-74 (citations and quotation marks omitted). Whether judgment as a matter of law on a discrimination claim is appropriate depends on factors including "'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case.'" *Tatum*, 408 F.3d at 549 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148-49 (2000)). Judgment as a matter of law may be granted when the plaintiff "fails to establish a legally sufficient evidentiary basis for the jury reasonably to find just one element of his . . . prima facie case." *Id.* at 449-50 (citation omitted).

To establish a *prima facie* case on her claims of discrimination based on Defendant's failure to promote her to the 1E Material Supervisor positions, Plaintiff must prove that: (1) she was a member of a protected group; (2) she was qualified and applied for a promotion to a position for which the employer was seeking applicants; (3) she was not promoted; and (4) similarly situated employees, not part of the protected group, were promoted instead. *Austin*, 193 F.3d at 995. In this context, "similarly situated" means Plaintiff must be "considered a viable candidate for the position." *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1086 (8th Cir. 2011) (citation omitted); *see Horton v. Shinseki*, No. 4:13-cv-00147 KGB, 2014 WL 7238145, at *3 (E.D. Ark. Dec. 17, 2014) (plaintiff failed to show he was similarly situated where he failed to submit a complete application package and the other individuals considered for the promotion did submit complete application packages).

Here, Plaintiff testified and argued throughout trial that she applied for the 2017 and 2018 1E Material Supervisor positions by emailing or faxing her resume to the then-manager of supply operations (Samantha Miller and Jennifer Perkins, respectively).[16] Additionally, Plaintiff

---

[15] Plaintiff has not argued or presented any direct evidence of race or age discrimination in the context of these particular positions.

[16] Plaintiff additionally testified she believes she handed Ms. Miller a copy of her resume for the 2017 position.

presented evidence Defendant acknowledged through an email Plaintiff's interest (though not her application) in at least the 2017 position; the email from a supervisor stated, "[t]hank you for your interest in the Supervisor 1E position. The bid has closed and it has been awarded. Thank you."[17] Further, Plaintiff testified that a supervisor told her not to bother applying for the 2017 position because she had already made her selection, and thus asserted an exception to the general rule that a plaintiff must show she applied as part of her prima facie showing as stated above. *Winbush v. Iowa By Glenwood State Hosp.*, 66 F.3d 1471, 1481 (8th Cir. 1995) ("[P]laintiffs need not prove they formally applied for a position if they allege facts which, if proven, would be sufficient to establish that application was futile due to the defendants' discriminatory practices."). Plaintiff further points to Kantrell Robinson's testimony that Ms. Robinson was unable to apply for the job because there was no submit button so as to apply through iTrakForce. (Doc. 152 at 68.) Despite Ms. Robinson's testimony as to her own experience, Plaintiff, however, steadfastly maintains she properly applied for the positions by following instructions on the bulletin to fax her resume. (Doc. 153 at 175.)

While the Court acknowledges these arguments and this evidence, at base, the record is clear: Plaintiff never properly submitted her application for either position. Testimony established that since 2009, Defendant has utilized iTrakForce for collective-bargaining or union positions within the company. Union employees use iTrakForce to "bid" or apply for these jobs. It is undisputed that Plaintiff did not use iTrakForce in relation to either 1E Material Supervisor position and just emailed or faxed (and possibly handed in) her resume. It is also undisputed the employees Defendant did identify and interview for each opening had utilized iTrakForce and thus were identified as candidates through iTrakForce. Plaintiff presented no evidence that any applicant outside of the protected group only emailed or faxed or handed in a resume without using iTrakForce and was interviewed or otherwise considered for the 1E Material Supervisor position openings in 2017 and 2018. Thus, Plaintiff failed to show similarly situated employees not part of the protected group were promoted to the positions instead. *See Jackson*, 643 F.3d at 1086; *Horton*, 2014 WL 7238145, at *3.

Additionally, the exception in *Winbush* and its progeny does not apply here. "[I]n order for an employee who conveys an interest in an open position to be exempted from the employer's

---

[17] Defendant presented evidence that this email responded to an employee's indication of interest and did not acknowledge an application had been submitted.

formal application requirement, the position sought must, *inter alia,* not have been officially posted or advertised." *E.E.O.C. v. Midw. Div.-RMC, LLC*, No. 04-00883-CV-W-REL, 2006 WL 6508508, at *2 (W.D. Mo. Aug. 17, 2006) (citing *Chambers v. Wynne Sch. Dist.,* 909 F.2d 1214, 1217 (8th Cir. 1990)). Here, there is no dispute that the bulletin was posted. Further, although Ms. Robinson testified *she* could not apply through iTrakForce, *Plaintiff* did not testify that she could not apply through iTrakForce. She instead testified that she did not do so because the instructions on the bulletin said to fax the resume. (Doc. 153 at 175.) Put simply, Plaintiff was not within the pool of candidates considered for the 1E Material Supervisor positions based on the means of her application; she therefore was not similarly situated to those chosen instead of her.

Additionally, and separately, Plaintiff cannot demonstrate a *prima facie* case for age discrimination regarding the 2018 1E Material Supervisor position for the simple reason that the individual chosen for that position, Cindi Wood, was significantly older than Plaintiff. *See McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 875-76 (8th Cir. 2007) (plaintiff failed to establish a *prima facie* case for age discrimination where the individual hired to replace plaintiff was older than plaintiff); *Schiltz v. Burlington N. R.R.* 115 F.3d 1407 (8th Cir. 1997) (plaintiff failed to make a *prima facie* showing of age discrimination as to the positions where the individuals hired were older or the same age as plaintiff or no more than five years younger than plaintiff).

Because Plaintiff has failed to present a *prima facie* case for age or race discrimination regarding the 2017 and 2018 1E Material Supervisor positions, even if they were not dismissed due to preemption, the Court would otherwise find Defendant entitled to judgment as a matter of law as to these claims. *See Tatum*, 408 F.3d at 549-550, 553.

**V. Conclusion**

Accordingly, the Court **ORDERS** as follows:

(1) Defendant's partial motion to dismiss (Doc. 131) is **GRANTED**:

   a. Plaintiff's § 1981 race discrimination claim for failure-to-promote into the 2017 1E Material Supervisor position is preempted by the RLA, and is **DISMISSED** for lack of subject matter jurisdiction;

   b. Plaintiff's § 1981 race discrimination claim for failure-to-promote into the 2018 1E Material Supervisor position is preempted by the RLA, and is **DISMISSED** for lack of subject matter jurisdiction; and

   c. Plaintiff's ADEA age discrimination claim for failure-to-promote into the 2018

     1E Material Supervisor position is preempted by the RLA, and is **DISMISSED** for lack of subject matter jurisdiction.

(2) The Court would otherwise find Defendant is entitled to judgment as a matter of law as to the claims dismissed above and grant Plaintiff's motion for judgment as a matter of law.

(3) Plaintiff's motion for motion for relief from interlocutory order (Doc. 144) is **DENIED**.

**IT IS SO ORDERED**.

            /s/ Roseann A. Ketchmark
            ROSEANN A. KETCHMARK, JUDGE
            UNITED STATES DISTRICT COURT

DATED: May 11, 2022

20

Case 4:19-cv-00480-RK   Document 168   Filed 05/11/22   Page 20 of 20